**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| SUN ZHONGJIAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ENCORE ENERGY CORP., PAUL GORANSON, and SHONA WILSON,<br><br>Defendants. | Case No. 4:25-cv-01234<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS


Nature and Summary of the Action ..... 1

Jurisdiction and Venue ..... 8

Parties ..... 9

Substantive Allegations ..... 10

A. EnCore's Operations and Transition from Foreign Filer to U.S. Domestic Filer ..... 10

B. Defendants Never Adequately Established enCore's Internal Controls Environment ..... 13

C. Both GAAP and IFRS Accounting Requirements Distinguish Between Resources and Proven Reserves—But Differ in How Expenses May be Capitalized ..... 16

D. EnCore Never Performed the Feasibility Tests Required to Capitalize Exploration and Development Costs ..... 20

Defendants' Materially False and Misleading Statements and Material Omissions ..... 22

The Truth Emerges ..... 33

Additional Scienter Allegations ..... 36

Loss Causation/Economic Loss ..... 48

Applicability of Presumption of Reliance: Fraud-On-The-Market Doctrine ..... 49

No Safe Harbor ..... 50

Class Action Allegations ..... 51

Count I ..... 52

Count II ..... 53

Prayer for Relief ..... 53

Demand for Jury Trial ..... 54

Lead Plaintiff Øystein Kjelsvik ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon personal knowledge as to Plaintiff, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of documents filed by Defendant enCore Energy Corp. ("enCore" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"), research reports issued by securities and financial analysts, press releases issued by Defendants, media and news reports, and other publicly available information about Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1. This is a securities fraud class action on behalf of all those who purchased, or otherwise acquired, enCore common stock during the period from March 28, 2024, and March 2, 2025, inclusive (the "Class Period"), who were damaged thereby (the "Class"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10 b-5.

2. This case concerns Defendants' deliberate exploitation of enCore's foreign-issuer status to portray the Company as a low-cost uranium producer with effective financial controls, while knowing facts that ultimately proved this narrative could not survive the transparency required under U.S. domestic-issuer reporting. Throughout the Class Period, Defendants relied on permissive foreign-filer accounting to mask escalating production costs and conceal fundamental deficiencies in internal controls over financial reporting. Defendants have since admitted that throughout the Class Period they knew enCore lacked the foundational elements of internal controls necessary to ensure proper financial reporting and that the Company's capitalization of

exploration and development costs were misleading because of a lack of proven uranium reserves. But enCore's annual and quarterly regulatory filings relied lax accounting to portray artificially lowered costs and omit reference to known material weaknesses, even while Defendants knew the Company was poised to lose its foreign-issuer status and become subject to SOX and U.S. GAAP, under which these practices were prohibited. As that transition approached, Defendants scrambled to address long-standing internal control failures while investors were kept in the dark. On March 3, 2025, the truth emerged in the Company's first regulatory filing compliant with U.S. standards. That filing revealed enCore's costs were far higher than previously reported, its internal controls were materially ineffective (because they had, until recently, been nonexistent), and the Company admitted that two years' worth of prior financial statements were unreliable due to millions in understated losses. The same day, enCore disclosed that its CEO, Paul Goranson, had been terminated. The fraud in this case is not that Defendants ultimately complied with U.S. standards when forced to do so, but that they knowingly concealed the facts revealed by that compliance during the Class Period, misleading investors about the Company's true financial condition.

3. EnCore engages in the acquisition, exploration, and development of uranium resource properties in the United States. The Company is headquartered in Corpus Christi, Texas, but incorporated under the laws of British Columbia, Canada. EnCore began trading on the NASDAQ on January 2, 2024.

4. EnCore primarily extracts uranium through in-situ recovery, a well-established uranium mining technology by which a water-based solution containing an oxidizing agent is circulated through an underground ore body so that dissolved uranium can be pumped to the surface through recovery wells, then later processed.

5. Like other companies that mine or extract natural resources, the amount of uranium enCore has access to through its operations as well as the costs associated with extracting those resources are core components of the Company's business and its related financial disclosures.

6. Throughout the Class Period, beginning on March 28, 2024, enCore touted the strength and integrity of its balance sheet in public statements and regulatory filings—while concealing known material weaknesses in its financial controls and rapidly growing losses attributable to exploration and development costs in the absence of proven uranium reserves.

7. On March 28, 2024, for example, enCore released its annual report on fiscal year 2023, showing a modest operating loss and touting the strength of enCore's financial reporting. The Company claimed "Management, including the CEO and CFO, assessed the effectiveness of the Company's internal control over financial reporting" and concluded that such control was "effective" and there were "no material weaknesses in the Company's internal control over financial reporting." The Company's CEO and CFO also affirmatively claimed that its certifications were consistent with the requirements of the Exchange Act. Those claims were false and the figures reported to investors were incorrect.

8. In truth, enCore's internal controls over financial reporting were plagued by obvious and known material weaknesses, while its financial reports took advantage of aggressive accounting to conceal operating expenses incurred as a result of production taking place at locations without proven uranium reserves. While investors were repeatedly reassured that enCore's reported financials complied with the appropriate standards, enCore knew for at least a year it had not taken even the foundational steps needed to ensure reliable internal controls over financial reporting and that its mounting costs were being concealed by its reliance on accounting gimmicks to capitalize its expenses.

9. Defendants knew, since March 2024 at the latest, that enCore's reliance on less stringent financial reporting and accounting standards available to foreign filers was coming to an end. On March 28, 2024, at a conference that coincided with the release of its annual report for fiscal year 2023, enCore's CFO, Shona Wilson acknowledged the likelihood that enCore would need come into compliance with the Sarbanes-Oxley Act in the coming year, saying "One of the great things we get to do this year is SOX. We'll be looking inward, and we'll be doing a lot of work to make sure that we're meeting the SOX requirements. I hope that will help you guys as investors, make sure, you know, feel that we have the right processes and controls that we need to." Wilson further stated, "From a transparency and compliance standpoint, again, I think we have a great set of financials." The processes to which Wilson was referring, the SEC's U.S. Shareholder Test and U.S. Business Contacts Test, determine when foreign filers must file as a domestic company, and comply with the associated regulatory requirements for financial controls and accounting. Wilson's statements confirmed enCore was aware of the impending transition as of the beginning of the Class Period. As noted above, on the same date, both Wilson and Goranson had affirmatively certified the Company's compliance with U.S. securities law and assured investors that enCore had no known material weaknesses with internal controls over financial reporting.

10. As 2024 progressed, enCore continued to release a steady drumbeat of positive financial news in press releases about expanding production at facilities located in the United States and in quarterly financial reports issued to investors including consolidated financial statements. In late November, the Company confirmed what Wilson had suggested back in March—effective January 1, 2025, enCore's filing status would change and the Company would report its financials to investors in a manner consistent with domestic filers, including compliance

with SOX. Investors were not told anything about how compliance with U.S. accounting standards would reveal a dramatically different picture of the Company's balance sheet than had been reported during the Class Period. The Company later admitted that, since June 2024 at the latest, executives had been scrambling to remediate known material weaknesses that were preventing enCore from establishing the foundation of an effective internal control system by U.S. standards.

11. On March 3, 2025, before the market opened, enCore announced its fiscal 2024 financial results, surprising investors by revealing a net loss of $61.3 million—more than double its net loss of $25.6 million in the prior fiscal year.

12. Worse, investors learned that the Company had "identified in 2024" material weaknesses with their internal controls over financial reporting and that the issues driving enCore's snowballing expenses impacted the Company's previously issued financial statement about its performance in 2023. EnCore wrote "[t]he Company reported a net loss of $61.3 million for the year ended December 31, 2024, compared to a $25.6 million net loss for the year ended December 31, 2023." The problems revealed on March 3, 2025, "impacted both years, totaling $15 million for 2024, and $8 million for 2023."

13. In summary, the Company acknowledged that it had been systematically understating its expenses by millions of dollars over the course of the previous year, and that the Company's previously issued annual report on FY23 released on March 28, 2024 was also incorrect because it understated the Company's expenses by $8 million for the same reasons. These revelations constituted a correction and restatement in all but name for two years-worth of financial disclosures.

14. The Company explained that the implosion of its balance sheet was related to a recent change in accounting standards, from those permitted for foreign filers to U.S. standards

required by U.S. securities law. EnCore stated that "the inability to capitalize certain exploratory and development costs under U.S. GAAP which would have been capitalized under IFRS [International Financial Reporting Standards]" impacted the Company's results. Further, the Company revealed that it had "***identified in 2024***" a "material weakness" in the Company's internal controls over financial reporting, "primarily due to an ineffective control environment that resulted in ineffective risk assessment, information and communications and monitoring activities" (emphasis added). The Company also admitted that "management, with oversight from the Audit Committee of the Board of Directors, began implementing corrective measures throughout the time period in 2024 in which the Company found it was required to be compliant with SOX [beginning on June 28, 2024] and have continued those efforts into 2025." Since June at the latest, the Company had been working to remediate material weaknesses with its internal financial controls that it had concealed from investors—problems which, as explained below, were so obvious they should have been readily apparent throughout the Class Period.

15. Theses admissions confirmed the Company had known for months that it did not meet the accounting requirements for U.S. domestic companies due to foundational weaknesses with its internal controls while at the same time its expenses and operating losses were snowballing. Defendants also knew the Company had not taken the necessary steps required to establish proven reserves and therefore capitalize their development costs.

16. Critically, nothing about enCore's business operations had changed in connection with becoming a U.S. domestic company—the only thing that changed on January 1, 2025 was the availability of less stringent accounting and reporting requirements that Defendants had used to conceal fundamental issues with the Company's finances from investors.

17. As described below, Domestic filers must adhere to Generally Accepted Accounting Principles ("GAAP") and U.S. standards for the internal controls over financial reporting. By contrast, foreign issuers can rely on substantively similar but less stringent International Financial Reporting Standards ("IFRS").

18. Generally, capitalized expenses are costs recorded as an asset on the balance sheet rather than expensed immediately on the income statement, because the cost is expected to provide economic benefits beyond the current accounting period. For example, if there are proven reserves, the cost of digging wells is an investment—in the absence of proven reserves, the same costs are properly categorized as an expense.

19. Both GAAP and IFRS have essentially identical applicable definitions and required processes concerning the assessment of business operations for mineral extraction companies like enCore. Both accounting practices distinguish between natural resources on the one hand, and proven reserves on the other. Under GAAP, certain costs incurred to extract resources in the absence of proven reserves are categorized as expenses—because there is more uncertainty about the economic benefit at the end of the process. IFRS, by contrast, allows more flexibility with respect to the capitalization of certain expenses in the absence of proven reserves. Similarly, the Sarbanes-Oxley Act mandates that management assess and report on the effectiveness of internal controls over financial reporting and external auditors must also attest to management's assessment. IFRS, by contrast, offers a more flexible, principles-based approach to internal controls, focusing on the objectives of the controls rather than providing a detailed list of required procedures.

20. Defendants knew enCore had not conducted the analyses required to establish proven reserves, but the financial reports provided to investors took advantage of the flexibility

provided by IFRS to portray the costs of the Company's operations as though they had. The result was a systematic understatement of expenses throughout 2024, even though the Company had known since March 2024 at the latest that they would likely have to be SOX compliant. Defendants also knew or were reckless in not knowing that enCore's internal controls over financial reporting did not satisfy the most basic requirements of SOX.

21. Finally, on the same day as the other revelations, March 3, 2025, the Company also revealed that "effective immediately," as of March 2, 2025, its CEO, Defendant Paul Goranson, was "no longer serving as enCore's Chief Executive Officer or as a member of the board of directors." The Company noted that it had appointed Robert Willette, enCore's Chief Legal and Compliance Officer, as the new acting Chief Executive Officer while it began a search for a permanent replacement for Goranson.

22. On this news, enCore's stock price fell $1.17, or 46.4%, to close at $1.35 per share on March 3, 2025, on unusually heavy trading volume. The drop in enCore's share price on March 3, 2025, was the single biggest one-day loss in the Company's history on the NASDAQ and brought it to a new 52-weeek low.

23. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class Members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

24. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 1367, and under §27 of the Exchange Act, 15 U.S.C. §78aa.

25. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

26. Venue is proper in this District under §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1931(b), as the Company has its U.S. corporate headquarters located in this District and conducts substantial business here.

27. In connection with the acts, omissions, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

28. Lead Plaintiff, Øystein Kjelsvik, is an individual investor. As set forth in the certification previously filed with the Court (ECF No. 19-2), which is incorporated by reference herein, Lead Plaintiff purchased enCore common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

29. Defendant enCore is incorporated under the laws of British Columbia, Canada with its principal executive offices located in Corpus Christi, Texas. EnCore's common shares trade on the NASDAQ exchange under the symbol "EU."

30. Defendant Paul Goranson ("Goranson") was the Company's Chief Executive Officer ("CEO") at all relevant times during the Class Period.

31. Defendant Shona Wilson ("Wilson") was the Company's Chief Financial Officer ("CFO") at all relevant times during the Class Period.

32. Collectively, Defendants Goranson and Wilson are referred to throughout this complaint as the "Individual Defendants."

33. The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected.

34. Because of their positions with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

35. EnCore and the Individual Defendants are referred to herein, collectively, as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. EnCore's Operations and Transition from Foreign Filer to U.S. Domestic Filer

36. EnCore engages in the acquisition, exploration, and development of uranium resource properties in the United States and markets itself as "the only United States uranium company with multiple Central Processing Plants in operation." The Company's key uranium projects are located in Texas, Wyoming, and South Dakota.

37. In 2024, enCore's operations ramped up considerably. The Company began extraction at two of its projects its Rosita Central Processing Plant ("CPP") in South Texas at the

beginning of 2024, and the Alta Mesa Uranium CPP and Wellfield ("Alta Mesa Project"), which enCore acquired in February 2023, in June 2024.

38. After commencing extraction, enCore represented that it became one of only three uranium extraction operations in the United States and the first in Texas in 10 years. Its remaining projects are in more preliminary development stages.

39. EnCore is incorporated under the laws of British Columbia, Canada, and despite numerous operations in the U.S., was originally designated as foreign filer in the U.S., not subject to the same stringent accounting and financial reporting standards as U.S. domestic filers whose securities trade on national exchanges.

40. Domestic filers must adhere to GAAP and U.S. standards for the internal controls over financial reporting. By contrast, foreign issuers, like enCore before January 1, 2025, can rely on substantively similar but less stringent IFRS.

41. As set out in detail below, both GAAP and IFRS have essentially identical applicable definitions and required processes concerning the assessment of natural resources as opposed to proven reserves—but IFRS allows more flexibility for the capitalization of certain expenses associated with exploration.

42. Generally, capitalized expenses are costs recorded as an asset on the balance sheet rather than expensed immediately on the income statement, because the cost is expected to provide economic benefits beyond the current accounting period. For example, if there are proven reserves, the cost of digging wells is an investment—in the absence of proven reserves, the same costs are properly categorized as an expense.

43. With respect to internal controls over financial reporting, IFRS offers a more flexible, principles-based approach to internal controls, focusing on the objectives of the controls rather than providing a detailed list of required procedures required under GAAP.

44. As explained below, throughout the Class Period, Defendants systematically took advantage of the leniency applied to foreign filers to conceal the existence of known material weaknesses in their internal controls over financial reporting and ballooning non-capitalizable expenses because of the absence of proven reserves.

45. As explained below, on March 28, 2024, enCore filed its annual report for FY 2023 with the SEC, touting its solid balance sheet and emphatically asserting that the informed opinion of the Individual Defendants was that there were no known weaknesses with the Company's internal controls over financial reporting. Substantively identical statements were furnished quarterly throughout 2024.

46. Under SEC rules, tests are applied annually, typically at the end of the second quarter, to determine whether foreign filers must file as domestic filers at the start of the next fiscal year. The tests consider factors including whether more than 50% of the issuer's outstanding voting securities are held by U.S. residents (the U.S. Ownership Test), and whether a majority of executive officers or directors are U.S. citizens or residents, whether more than 50% of the issuer's assets are located in the U.S., or whether the company's business is principally administered in the U.S. (the U.S. Business Contacts Test).

47. As of June 28, 2024, enCore met the requirements to be subject to the requirements for U.S. domestic filers.

48. On November 27, 2024, enCore announced its impending change in regulatory status and clarified that, effective January 1, 2025, its reporting status with the SEC would change

from a foreign filer to a U.S. domestic filer. As a result, the Company would also transition from IFRS to GAAP for all its financial reporting requirements.

49. In preparation for the switch to GAAP, enCore also announced on November 27, 2024, that it would be appointing KPMG LLP as its new auditor as "necessary support for enCore's transition to a U.S. domestic filer." Davidson & Company LLP previously served as enCore's auditor since 2016.

50. Importantly, as described below, the fundamental problems underlying both enCore's financial statements, namely the absence of proven reserves, and internal controls, including a pronounced lack of process-level control activities related financial reporting and ineffective general information technology controls, substantially predate the Class Period. Indeed, the Company admitted that its financial statement concerning FY 2023 understated the Company's expenses by $8 million. The only thing that changed on January 1, 2025, was the availability of less stringent accounting and reporting requirements that Defendants had used to conceal those issues from investors.

**B. Defendants Never Adequately Established enCore's Internal Controls Environment**

51. The requirements for Internal Controls over Financial Reporting ("ICFR") are designed to ensure the reliability of publicly reported financial information and prevent fraud. The Sarbanes-Oxley Act mandates that management assess and report on the effectiveness of their companies' ICFR systems and external auditors must also attest to managements' assessments. Contrary to GAAP, IFRS offers a more flexible, principles-based approach to internal controls, focusing on the objectives of the controls rather than providing a detailed list of required procedures.

52. Internal controls requirements under GAAP are typically implemented through the Internal Control Integrated Framework published by the Committee of Sponsoring Organizations

("COSO") of the Treadway Commission, which includes five components: control environment, risk assessment, control activities, information and communication, and monitoring.

53. The first component of COSO, the control environment, underpins how ICFR is carried out across all levels of the entity. It includes the set of standards, processes, and structures that provide the basis for carrying out internal controls across an entity, as well as the awareness and actions of those charged with governance and management concerning the entity's ICFR and its importance. Once an effective control environment is established, one of managements' requirements under COSO is to assess the potential for fraud in evaluating risks.

54. Before shifting to U.S. domestic standards, enCore's Annual Reports did not include an assessment of internal controls because it was not required under Canadian standards, including CPAB. On March 28, 2024, Defendants stated in enCore's Annual Report filed on Form 40-F that management had used the COSO criteria to assess the effectiveness of enCore's internal controls and had deemed them effective. But Defendants did not disclose that under the COSO criteria they had failed to take even the most fundamental steps to ensure accuracy in financial reporting.

55. EnCore explained their shift in approach, stating, "[a]s a domestic issuer, we are now required to maintain effective disclosure controls and procedures and internal controls over financial reporting" and "[o]n June 28, 2024, the Company met the requirements to be subject to the Sarbanes-Oxley Act of 2002 Section 404(b) ("SOX") as of December 31, 2024, requiring retroactive application to January 1, 2024."

56. Unbeknownst to investors, however, Defendants failed to establish even the foundational control environment component of COSO. EnCore later admitted in March 2025 that "management, with oversight from the Audit Committee of the Board of Directors, began

implementing corrective measures throughout the time period in 2024 in which the Company found it was required to be compliant with SOX [beginning on June 28, 2024] and have continued those efforts into 2025."

57. The material weaknesses being remediated included "ineffective general information technology controls ("GITCs")" and that "[t]he Company did not effectively design, implement, or operate process-level control activities related to its financial reporting processes." Both of these material weaknesses "were primarily due to an ***ineffective control environment*** that resulted in ineffective risk assessment, information and communications and monitoring activities." (emphasis added). In other words, enCore was deficient in at least four out of the five COSO components, stemming from the foundational control environment.

58. EnCore further explained that it "did not have a sufficient number of trained resources" to implement an effective internal control system, "did not have an effective risk assessment process" related to internal controls, "did not have an effective information and communication process... to ensure the reliability of information used in financial reporting and that communicates relevant information about roles and responsibilities for internal control[,]" and "did not have effective monitoring activities to assess the operation of internal control[.]"

59. Despite these major material weaknesses that cut to the foundation of enCore's internal control system, Defendants represented on March 28, 2024 that "management, including the CEO and CFO, assessed the effectiveness" of enCore's internal controls using the COSO criteria and "management has concluded that, as of December 31, 2023, the Company's internal control over financial reporting was effective and no material weaknesses in the Company's internal control over financial reporting were discovered."

60. Even though enCore was not subject to SOX requirements at that time and was not yet required to assess internal controls, Defendants represented in their annual report for FY 2023 filed on Form 40-F on March 28, 2024 that management's assessment of internal controls was consistent with what was required under the Exchange Act and made using the same COSO framework.

61. Given enCore's later admission that significant, foundational remediation efforts were underway by June 2024 and continued into 2025, Defendants could not have deemed enCore's internal controls effective in March 2024. The material weaknesses were core structural issues that would have existed at the formation of enCore's ICFR system.

### C. Both GAAP and IFRS Accounting Requirements Distinguish Between Resources and Proven Reserves—But Differ in How Expenses May be Capitalized

62. Financial statements are a central feature of financial reporting and are a principal means of communicating financial information to investors. For companies such as enCore, the accounting profession and the SEC recognize Generally Accepted Accounting Principles ("GAAP") as the uniform rules, conventions, and procedures necessary to define and reflect accepted accounting practices at a particular time. SEC Regulation S-X states that financial statements filed with the SEC that are not prepared and presented in accordance with GAAP "will be presumed to be misleading or inaccurate, despite footnotes or other disclosures." 17 C.F.R. § 210.4-01(a)(1). GAAP violations, therefore, bear on whether SEC regulations for publicly-traded companies, such as enCore, have been properly followed and satisfied.

63. GAAP are primarily promulgated by the Financial Accounting Standards Board ("FASB") and are codified into a system that has been accepted by the SEC as the framework by which public companies must report their financial position and the results of their operations

(among other things)—i.e., SEC regulations require that public company financial statements be prepared in conformity with GAAP.

64. Under GAAP, accounting for costs related to mineral properties, including uranium, follows specific guidelines that distinguish between the different stages of operations. Exploratory costs, such as geological surveys, exploratory drilling, and sampling, are generally treated as research and development (R&D) activities and are expensed as incurred. This is due to the high degree of uncertainty regarding the existence of commercially viable reserves.

65. Subsequent development costs including well construction, piping, roads, and other infrastructure are also expensed under GAAP until the project is ready for commercial production. Once a commercially viable and technically feasible mineral reserve is established (labeled "proven or probable mineral reserves" by the SEC) development can be capitalized in certain circumstances under GAAP and then amortized (depreciated) on a unit-of-production basis once extraction begins.

66. Nearly identical definitions and processes for distinguishing between "resources" on the one hand and proven "reserves" on the other are required under IFRS.

67. Before the Company's change in filing status on January 1, 2025, enCore reported the mineral resources of the projects it has an interest in according to IFRS and Canadian standards, including National Instrument 43-101 – Standards of Disclosure for Mineral Projects ("NI 43-101") and the Canadian Institute of Mining, Metallurgy and Petroleum (the "CIM") – Definition Standards on Mineral Resources and Mineral Reserves (the "CIM Standards").

68. While IFRS standards are more relaxed for exploration-stage companies, their definition of "proven or probable" is essentially the same as the applicable U.S. standards (under

SEC Regulation S-K 1300), and enCore never reported proven or probable reserves under either U.S. or international reporting standards.

69. Under the Canadian NI 43-101, a mineral reserve is defined as "the economically mineable part of a measured or indicated mineral resource demonstrated by at least a preliminary feasibility study." A "probable mineral reserve" is "the economically mineable part of an indicated and, in some cases, a measured mineral resource demonstrated by at least a preliminary feasibility study" and a "proven mineral reserve" is "the economically mineable part of a measured mineral resource demonstrated by at least a preliminary feasibility study."

70. Both U.S. reports prepared pursuant to SEC regulations and NI 43-101 reports classifying mineral results, referred to as Technical Report Summaries ("TRSs"), must be produced by a "Qualified Person." Typically, these reports are produced by independent companies without affiliation with the mineral property, often consisting of one or more qualified persons along with one or more consulting companies. EnCore prepared TRSs under NI 43-101 on several occasions during and before the Class Period.

71. EnCore's 2024 SEC filings, including Form 6-Ks filed on June 20, 2024 and January 17, 2024, referenced the TRS for the Alta Mesa Uranium Project prepared by Douglas Beahm, an independent party, effective January 19, 2023. The summary was also reviewed and approved by John M. Seeley, enCore's Manager of Geology and Exploration and a "Qualified Person" under both NI 43-101 and SEC Regulation S-K 1300. On his LinkedIn page, Defendant Goranson states that he is a "'Qualified Person' as defined by National Instrument 43-101 and Regulation S-K 1300."

72. The TRS for the Alta Mesa Uranium Project prepared for enCore and referenced in its regulatory filings made during the Class Period clarified: "No preliminary economic

assessment, pre-feasibility study or feasibility study has been completed to NI 43-101 standards; and, ***no mineral reserves are stated in this report***." Rather than "reserves," the report thus only classified mineral "resources."

73. As of January 1, 2025, enCore began reporting all mineral results in accordance with Item 1302 of SEC Regulation S-K ("S-K 1300"). As with the Canadian NI 43-101, the SEC's regulations require uranium mining companies to use a "Qualified Person" to prepare its disclosures, with a TRS for initial or material changes and considering factors like economic viability and environmental aspects. As enCore itself also stated in March 2025, that "S-K 1300 is substantively the same as NI 43-101."

74. Under S-K 1300, mineral "resources" must also be measured, indicated, or inferred, while mineral "reserves," with the possibility of capitalizing certain costs, must be "proven or probable." S-K 1300 likewise provides that "proven" reserves are the economically mineable portion of a measured mineral resource with a high degree of confidence demonstrated by a feasibility study, while "probable" reserves are the economically mineable portion of a measured or indicated mineral resource with economic extraction reasonably justified by a feasibility study with a lower degree of confidence.

75. The only key difference for enCore's public reporting resulted from the treatment of mineral resource costs under GAAP. Historically, enCore benefitted from IFRS's more liberal approach to exploration and development costs. In particular, IFRS 6 allows companies to capitalize costs related to the exploration and evaluation of natural resources even if the technical and commercial viability of the resource has not yet been proven. This flexibility is designed to foster early-stage development and mitigate the initial financial impact on financial statements. In contrast, the applicable rules under GAAP, including ASC 930 which governs accounting for

extractive activities, are more conservative and generally do not allow costs to be capitalized before reserves are proven or probable.

76. While IFRS standards allow certain costs to be capitalized for exploration-stage companies in the absence of proven reserves, IFRS standards do not *preclude* such costs as being properly categorized as expenses. Put another way, enCore took advantage of aggressive accounting tactics to conceal expenses because they believed it was advantageous in the short term to do so. For Defendants, the result was an exploration stage company with no proven reserves that could take advantage of flexible accounting standards to generate a balance sheet that appeared as though enCore's operational expenses were far less expensive and risky than they actually were.

**D. EnCore Never Performed the Feasibility Tests Required to Capitalize Exploration and Development Costs**

77. Defendants knew that enCore did not have "proven or probable" reserves long before the Company filed its first Form 10-K in March 2025.

78. For example, enCore's annual report to shareholders for 2022 noted explicitly that the Company was "not basing its production decisions at Alta Mesa or Rosita on a feasibility study of mineral reserves demonstrating economic and technical viability." EnCore stated further that it understood there was "increased uncertainty, and consequently a higher risk of failure, when production is undertaken in advance of a feasibility study" and additionally that "the mineral resource at Alta Mesa includes inferred resources which are considered too speculative geologically to have economic considerations applied to them that would enable them to be categorized as mineral reserves."

79. Similarly, enCore's annual report to shareholders on the Company's performance in 2023 noted the definitions of "resources" as opposed to "reserves" under both Canadian law and the Exchange Act and stated "[t]he Company advises that it is not basing its production decisions

at Alta Mesa CPP on a feasibility study of mineral reserves demonstrating economic and technical viability."

80. EnCore's 2024 SEC filings, including Form 6-Ks filed on June 20, 2024 and January 17, 2024, referenced the TRS for the Alta Mesa Uranium Project prepared by Douglas Beahm, an independent party, effective January 19, 2023. The TRS provided mineral ***resource*** summaries but did not classify any "proven or probable reserves" which were necessary to capitalize their exploratory and development costs under GAAP.

81. On February 27, 2025, enCore filed a Form 8-K containing TRSs "prepared in accordance with U.S. Securities & Exchange Commission ("SEC") Regulation S-K 1300" for four of its key uranium projects: the Alta Mesa Uranium Project, the Mesteña Grande Uranium Project, the South Texas Integrated Uranium Projects, and the Gas Hills Uranium Project. The TRSs again provided mineral ***resource*** summaries for all four projects but, like enCore's prior TRS for Alta Mesa, did not classify any "proven or probable reserves." Like the Company's prior reports, the "technical information" included in the release was approved by Seeley.

82. EnCore's 10-K, filed with the SEC on March 3, 2025, ultimately explained:

> As of December 31, 2024, the Company is an "Exploration Stage Issuer" as defined by S-K 1300, and as required by the SEC to be defined as a Development Stage Issuer as it has not established proven or probable Mineral Reserves, through the completion of a pre-feasibility or feasibility study for any of our uranium projects. ***Even though we commenced extraction of uranium at our Rosita Uranium Project and our Alta Mesa Uranium Project, the Company remains classified as an Exploration Stage Issuer and will continue to remain an Exploration Stage Issuer until such time as Proven or Probable Mineral Reserves have been established at one of our uranium projects.***

83. Thus, enCore's management knew that enCore never had the requisite feasibility support to classify its projects as proven or probable reserves. Instead, enCore had instead been consistently evaluating its mining projects as resources with a lesser degree of confidence, thereby

systematically understating its expenses and concealing a substantial portion of its operating losses by taking advantage of the more lenient IFRS standards.

84. In sum, the Company and the Individual Defendants knew enCore had never conducted the analyses necessary to determine proven or probable reserves—a fact which the Individual Defendants, based on their background, experience, and, in the case of Goranson, status as "Qualified Persons," knew or should have known would influence the categorization of expenses reported or incurred during the Class Period.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS

85. The Class Period starts on March 28, 2024, when enCore filed its annual report on Form 40-F with the SEC (the "FY23 40-F"). The FY23 40-F attached a consolidated financial statement stating that enCore's operating losses from operations were $35.8 million and net operating loss for the year ending December 31, 2023 was $22.38 million.

86. The FY23 40-F also assured investors that the Company's "disclosure controls and procedures were effective." Specifically, the FY23 40-F stated as follows in relevant part:

> *Report on disclosure controls and procedures*. At the end of the period covered by this Annual Report for the fiscal year ended December 31, 2023, an evaluation was carried out under the supervision of, and with the participation of, the Company's management, including its Chief Executive Officer (CEO) and Chief Financial Officer (CFO), of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act). ***Based upon that evaluation, the Company's CEO and CFO have concluded that the Company's disclosure controls and procedures were effective to give reasonable assurance that (i) information required to be disclosed by the Company in reports that it files or submits to the Commission under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in applicable rules and forms, and (ii) material information required to be disclosed in the Company's reports filed under the Exchange Act is provided to the Company's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow for timely decisions regarding required disclosure.***

87. The FY23 40-F also assured investors that the Company's internal controls were effective, stating:

> ***Management, including the CEO and CFO, assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2023. In making this assessment, management used the criteria set forth in the Internal Control Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on its assessment, management has concluded that, as of December 31, 2023, the Company's internal control over financial reporting was effective and no material weaknesses in the Company's internal control over financial reporting were discovered.***

88. The statements referenced above in ¶¶85-87 were materially false and/or misleading and failed to disclose material facts because Defendants knew enCore lacked the foundational elements of internal controls necessary to prevent fraud and were understating enCore's costs and expenses. As was later revealed on March 3, 2025, enCore's consolidated financial statement for the 2023 fiscal year understated the Company's expenses by $8 million. Additionally, Defendants knew or should have known that enCore's internal controls were not "effective" because underlying problems with the classification of enCore's mineral resources were known to Defendants well before March 2024. As the Company later admitted, by June 2024 at the latest, the Company and the Individual Defendants were actively remediating material weaknesses with internal controls over financial reporting stemming from a lack of an adequately established control environment—the foundational COSO component—despite claiming that management used COSO criteria for its assessments. The nature of the fundamental issues supposedly in the process of being remediated as of June 2024 confirms they could not have been effective at the time of the statements above in March 2024. At the time the above statements were made, Defendants had never previously assessed enCore's internal controls in prior periods and had never previously attested to their effectiveness because it was not required under IFRS. enCore's ineffective control environment resulted in ineffective risk assessment, ineffective

information and communications, and ineffective monitoring activities, all core components of a functioning ICFR system necessary to prevent fraud which led to the widespread issues described herein. Had Defendants "assessed the effectiveness" of enCore's internal controls as claimed, they would have discovered that at least four out of the five COSO factors were insufficient, leading to a severely lacking ICFR system under U.S. standards.

89. On the same date, March 28, 2024, enCore hosted its first Annual Investor Day at the Nasdaq in New York City and posted a video of presentations by senior management on the Company's YouTube account.[1] During the presentation, Goranson spoke positively about the Company's production costs at Rosita beginning at 28:57 of the video, stating:

> A little bit about Rosita....There's a lot of areas where we've got properties where there's mineral resources we're advancing right now. We should hope to have in production within a year hopefully, to be able to within the year to get those into production ***to sustain what we've already done at Rosita and increase production capacity. The all-in costs are what we believe are going to be are very economic and very competitive and I don't want to get much more specific to that at this point but I feel very good about our production cost and if you go our and see our sites you can see why. The infrastructure is relatively light*** with respect to drill holes, just cased wells in the ground, small footprints, you saw video and you saw the satellite plant, that was less than a million dollars to build that satellite plant. ***And that allows us to leverage and deploy more production sources out there by and feed in Rosita to sustain it. And the next production is going to be coming from Upper Spring Creek which you see on the map it's about 60 miles, 45 miles away and we can do that economically***.

90. The statements referenced above in ¶89 were materially false and/or misleading and omitted material facts necessary to make them not misleading because Defendants knew enCore's costs and expenses would be significantly increasing due to the production costs at Rosita and Alta Mesa and because Defendants knew they had not completed the feasibility studies required to declare proven or probable reserves, which would have been necessary to appropriately

[1] EnCore uploaded to YouTube a video recording of the full Investor Day Presentation from March 28, 2024 which is available at: https://www.youtube.com/watch?v=TBU78p1WD2s, last accessed on January 5, 2026.

capitalize those production costs. The true cost of enCore's exploration and development costs revealed in March 2025, driven by increased activity at both Rosita and Alta Mesa, caused enCore's expenses and net loss to appear to skyrocket compared to what the Company had led investors to believe by systematically underreporting those expenses under lenient IFRS standards. But the facts underlying that dramatic shift in financial losses had been known to Defendants all along. Goranson's statements that the all-in costs at Rosita would be "very economic" and that enCore's light infrastructure would allow future productions to be done "economically" were revealed to be false on March 3, 2025, when enCore reported that operating expenses for the full-year 2024 were "$60,188 as compared to $39,834 for the year ended December 31, 2023" which was "*driven primarily by the extraction of uranium at Alta Mesa and Rosita which commenced in 2024*" (emphasis added). EnCore took advantage of aggressive accounting available under the more lenient IFRS standards to make the Rosita site's operating costs appear lower than they actually were. At the time of the Investor Day presentation, Goranson knew and admitted that enCore had not conducted the required feasibility studies to report mineral reserves with "proven or probable" confidence, and therefore knew or should have known that enCore could not properly capitalize their costs associated with infrastructure development at Rosita.

91. Goranson's statements in ¶89 above were also misleading because enCore "identified in 2024" multiple "material weaknesses" in its internal controls over financial reporting. Those weaknesses were "primarily due to an ineffective control environment" that created widespread issues including that enCore "did not effectively design, implement, or operate process-level control activities related to its financial reporting processes" and "did not have an effective information and communication process...to ensure the reliability of information used in financial reporting." Had Defendants "assessed the effectiveness" of enCore's internal controls by

March 2024 as previously claimed, they would have discovered core issues in the Company's financial reporting which were necessary to prevent fraud, including Defendants' significant understatement of enCore's expenses in 2024. Goranson's assessment of Rosita's production costs as "very economic" and "very competitive" therefore omitted material facts necessary to make them not misleading and lacked an adequate basis.

92. Later in the same presentation on March 28, 2024, an audience member asked a follow-up question about what costs "look like going forward," and Goranson responded at approximately 1:10:53, stating:

> There's a couple of things, one is, that I'm going to give a little bit of a shout out to TradeTech and their production cost indicator, which has been a great tool for supporting our ask for our floors. It sets an independent view of what that number should be and ***so we know what our costs are, our costs are you know if you take the way Alta Mesa operated back in the time when it was operating over a million pounds per year, that would relate to you know if you adjust it for today's cost about in the low 20s per pound. And the same goes for the all in costs around 40, 40 something dollars per pound.*** But again, different markets different time you know with inflation and everything, but that's kind of what if you were take those costs and adjust it and so you see those numbers are consistent with the PCI [production cost indicator] that's published so really allows us to set these use it to, you know helps Jamie with setting floors on contracts and everything else. The good thing is now we can pretty much, without too much argument, get decent floors, and much above even what the PCI is.

93. The statements referenced above in ¶92 were materially false and/or misleading and failed to disclose material facts for the same reasons as explained in ¶¶88, 90-91. Goranson's claim that "we know what our costs are" was false and misleading and omitted necessary material facts because Goranson knew or should have known that (1) enCore had fundamental problems with its internal controls over financial reporting necessary to prevent fraud, including about the costs of production, and (2) enCore's expenses would significantly increase due to high production costs at Rosita and Alta Mesa and because Defendants declined to complete feasibility studies to categorize proven or probable reserves, which was necessary to capitalize those production costs.

As the Company later admitted, operating expenses for the full-year 2024 almost doubled what had been previously reported "driven primarily by the extraction of uranium at Alta Mesa and Rosita which commenced in 2024"—precisely the same costs that Goranson claimed enCore "knew" in his statement.

94. In response to an additional question from an audience member about the recent drill results at Alta Mesa, Goranson stated in pertinent part, beginning at 1:35:27:

> ***One of the reasons why we don't go to like, feasibility studies, and reserves is because by the time you get to that level of drilling, we've already got a well field in. And we've already, that means your decision's already made so we started inferred and indicated, and that's what gives us the ability to go to production.*** And I know that doesn't always fit the regulatory structure on reporting and everything else. It's not a, ***we're definitely a round peg that fits in a square hole, and uh on how we do our calculations and everything.*** But having those results gives us very strong confidence that we're going to see really good, and you know I'm not going to speculate too much, do too much forward looking, but the expectation is that there's roughly 1.3 million pounds of uranium in in the original 4311for production area 7. I suspect based on these results it's going to be significantly higher.

95. The statements referenced above in ¶94 were materially false and/or misleading and failed to disclose material facts for the same reasons as explained in ¶¶88, 90-91, and 93. Goranson's statement omitted facts about the impact the absence of proven reserves would have on enCore's balance sheet and misleadingly characterizing a known failure to analyze and document the value of mineral resources in a way that would protect investors as a savy business move informed by experience. Thus, Goranson's statements gave investors a misleading impression of enCore's business by failing to explain the material adverse effects on the Company's balance sheet as a result of failing to conduct feasibility studies. A reasonable investor listening to Goranson's presentation would have been led to believe feasibility studies practical meaning, because "by the time you get to that level of drilling, we've already got a well filled in...and that's what gives us the ability to go to production." Stating that the Company was "a

round peg that fits in a square hole" misleadingly suggested that enCore's financial reporting associated with its operations still "fits" regulatory requirements. In reality, the effect of the Company's failure to conduct feasibility studies was simply concealed from investors through creative accounting until the truth was revealed on March 3, 2025.

96. Also at the same conference, Wilson addressed enCore's new "financial strength," as titled on the presentation slide, and described enCore's confidence in complying with U.S. accounting and regulatory standards, stating at approximately 53:48: "***One of the great things we get to do this year is SOX. We'll be looking inward, and we'll be doing a lot of work to make sure that we're meeting the SOX requirements.*** I hope that will help you guys as investors, make sure, you know, feel that we have the right processes and controls that we need to." Wilson further stated at approximately 55:20: "***From a transparency and compliance standpoint, again, I think we have a great set of financials***."

97. The statements referenced above in ¶96 were materially false and/or misleading and failed to disclose material adverse facts for the same reasons as explained in ¶¶88, 90-91, and 93. Wilson's statements was false and misleading and omitted necessary material facts because Wilson knew or should have known that (1) enCore had fundamental problems with its internal controls over financial reporting necessary to prevent fraud, including reporting of enCore's financial stability, and (2) enCore's expenses would significantly increase due to high production costs at Rosita and Alta Mesa and because Defendants declined to complete feasibility studies to categorize proven or probable reserves, which was necessary capitalize those production costs. As the Company later admitted, operating expenses for the full-year 2024 almost doubled what had been previously reported "driven primarily by the extraction of uranium at Alta Mesa and Rosita which commenced in 2024" and net loss for the full-year 2024 almost tripled—demonstrating that

enCore was not "financially stable" nor able to adjust to SOX requirements as represented. As the Company later admitted, both Goranson and Wilson were remediating fundamental internal controls weaknesses in 2024. Had Wilson truly evaluated enCore's financials from a "transparency and compliance standpoint," she would have discovered core internal controls weaknesses in the Company's financial reporting, including Defendants' significant understatement of enCore's expenses in 2024. Wilson's statements also confirm that Defendants knew throughout the Class Period that their financial reporting would likely be retroactively subject to the standards set by SOX, including the requirement that financial reports comply with GAAP and that internal controls meet specific standards. Wilson's statements were therefore additionally misleading by reassuring investors that enCore had a "great set of financials" while Defendants were in possession of facts confirming that a material restatement of those same financials would be all but unavoidable.

98. On May 13, 2024, enCore announced its financial results for the three months ended March 31, 2024 on a Form 6-K filed with the SEC (the "Q1 2024 6-K"). The report was submitted with the Company's unaudited condensed interim consolidated financial statements for the three months ended March 31, 2024 as exhibit 99.1. Therein, enCore reported its Condensed Interim Consolidated Statements of Financial Position, with Defendants representing that net loss for the period was significantly less than the prior period, at "***5,317,847***" for the three months ended March 31, 2024, compared to the "7,474,333" previously reported for the three months ended March 31, 2023. Defendants also reported that "loss from operations" was "7,446,762" for the three months ended March 31, 2024, compared to "7,733,686" for the prior period in 2023.

99. The Q1 2024 6-K also included certifications signed by Defendant Goranson and Defendant Wilson as exhibits indicating "N/A" or "not applicable" with respect to material weaknesses for internal controls over financial reporting.

100. The statements referenced above in ¶¶98-99 were materially false and/or misleading and failed to disclose material adverse facts for the same reasons as explained in ¶¶88, 90-91, and 93. Goranson and Willson's certifications omitted material facts relevant to the known material weaknesses with enCore's internal controls over financial reporting. The financial figures included in the consolidated financial statement understated enCore's expenses by improperly capitalizing costs associated with production in the absence of proven reserves. In addition, representing that the Company's net loss and loss from operations figures remained steady compared to the prior periods in 2023 gave investors the false impression that enCore's losses were poised to remain steady. In reality, Defendants knew that, because of the absence of proven reserves, increased costs associated with production at Rosita and Alta Mesa would lead to substantially higher expenses and a resulting exaggerated net loss in 2024. EnCore revealed on March 3, 2025 that operating expenses for the full-year 2024 were "$60,188 as compared to $39,834 for the year ended December 31, 2023" which was "driven primarily by the extraction of uranium at Alta Mesa and Rosita which commenced in 2024." The Company also reported a net loss of $61.3 million for 2024, compared to a $25.6 million from 2023, impacted by "[t]he inability to capitalize certain exploratory and development costs under U.S. GAAP which would have been capitalized under IFRS."

101. On August 14, 2024, enCore submitted the Company's interim report of foreign private issuer for the six months ended June 30, 2024 on a Form 6-K filed with the SEC (the "Q2 2024 6-K"). The report was submitted with the Company's unaudited condensed interim

consolidated financial statements for the six months ended June 30, 2024 as exhibit 99.1. Therein, enCore reported its Condensed Interim Consolidated Statements of Financial Position, and Defendants reported a "net loss for the period before taxes and non controlling interest" of "***8,709,300***" for the three months ended June 30, 2024, and "***14,005,782***" for the six months ended June 30, 2024, compared to the figures of "7,517,764" and "14,992,097" for the respective prior periods in 2023. Defendants also reported that "loss from operations" was "***9,361,809***" for the three months ended June 30, 2024 and "***16,770,935***" for the six months ended June 30, 2024, compared to "7,013,540" and "14,747,226" for the respective prior periods in 2023.

102. The Q2 2024 6-K also included certifications signed by Defendant Goranson and Defendant Wilson as exhibits indicating "N/A" or "not applicable" with respect to material weaknesses for internal controls over financial reporting.

103. The statements referenced above in ¶¶101-102 were materially false and/or misleading and failed to disclose material adverse facts for the same reasons as explained in ¶¶88, 90-91, and 93. Goranson and Willson's certifications omitted material facts relevant to the known material weaknesses with enCore's internal controls over financial reporting. The financial figures included in the consolidated financial statement understated enCore's expenses by improperly capitalizing costs associated with production in the absence of proven reserves. In addition, representing that the Company's net loss figure remained steady compared to the prior period in 2023 continued to give investors the false impression that enCore's losses were poised to remain steady. In reality, Defendants knew that increased costs associated with production at Rosita and Alta Mesa would lead to substantially higher expenses and a resulting exaggerated net loss in 2024. And the Individual Defendants had been in the process of remediating material weaknesses in enCore's internal controls over financial reporting since at least June 28, 2024, including the issues

that enCore "did not effectively design, implement, or operate process-level control activities related to its financial reporting processes" and "did not have an effective information and communication process...to ensure the reliability of information used in financial reporting."

104. On November 14, 2024, enCore submitted the Company's interim report of foreign private issuer for the nine months ended September 30, 2024 on a Form 6-K filed with the SEC (the "Q3 2024 6-K"). The report was submitted with the Company's unaudited condensed interim consolidated financial statements for the nine months ended September 30, 2024 as exhibit 99.1. Therein, enCore reported its Condensed Interim Consolidated Statements of Financial Position, and Defendants reported a "net loss for the period before taxes and non controlling interest" of "***17,467,590***" for the three months ended September 30, 2024, compared to the figure of "9,303,781" for the respective prior period in 2023. Defendants also reported a "loss from operations" of "***14,409,137***" for the three months ended September 30, 2024 and "***31,180,307***" for the nine months ended September 30, 2024.

105. The Q3 2024 6-K also included certifications signed by Defendant Goranson and Defendant Wilson as exhibits indicating "N/A" or "not applicable" with respect to material weaknesses for internal controls over financial reporting.

106. The statements referenced above in ¶¶104-105 were materially false and/or misleading and failed to disclose material adverse facts for the same reasons as explained in ¶¶88, 90-91, and 93. Goranson and Willson's certifications omitted material facts relevant to the known material weaknesses with enCore's internal controls over financial reporting. The financial figures included in the consolidated financial statement understated enCore's expenses by improperly capitalizing costs associated with production in the absence of proven reserves. In addition, despite representing a higher net loss figure compared to the prior period, investors were still unaware that

the Company's true expenses associated with production at Rosita and Alta Mesa would lead to a substantially greater net losses for both the quarter and the full-year. Additionally, at the time the statements above were made, based on the disclosures made March 3, 2025, Defendants were already months into actively remediating known material weaknesses that were preventing enCore from "ensur[ing] the reliability of information used in financial reporting." The Q3 2024 6-K was materially misleading by omitting any reference to Defendants then ongoing remediation efforts.

107. On November 27, 2024, Defendants disclosed the Company's impending change in reporting status beginning on January 1, 2025, and that it was changing its auditor to KPMG.

**THE TRUTH EMERGES**

108. On March 3, 2025, before the market opened, enCore announced its fiscal 2024 financial results in a press release, reporting, among other things, a net loss of $61.3 million, double the Company's net loss of $25.6 million in the prior fiscal year. The Company explained "the inability to capitalize certain exploratory and development costs under U.S. GAAP which would have been capitalized under IFRS [International Financial Reporting Standards]" impacted the Company's results. The press release stated the following, in relevant part:

> Net Income/Loss: The Company reported a net loss of $61.3 million for the year ended December 31, 2024, compared to a $25.6 million net loss for the year ended December 31, 2023. The inability to capitalize certain exploratory and development costs under U.S. GAAP which would have been capitalized under IFRS impacted both years, totaling $15 million for 2024, and $8 million for 2023.

109. Put another way, the Company acknowledged that it had been systematically understating its expenses by millions of dollars over the course of the previous year, and that the FY23 40-F released on March 28, 2024 understated the Companies expenses by $8 million.

110. The Company also revealed in the same press release that it had appointed a new acting Chief Executive Officer "effective immediately" and Paul Goranson "is no longer serving

as enCore's Chief Executive Officer or as a member of the board of directors." The Company noted that the change in leadership had been made as of March 2, 2025.

111. On the same date, March 3, 2025, the Company submitted its annual report on a form 10-K, filed with the SEC. In its annual report, the Company revealed that:

> Operating expenses, excluding stock option expenses, for the year ended December 31, 2024, were $60,188 as compared to $39,834 for the year ended December 31, 2023. This increase primarily reflects the growth and increased activity levels the Company experienced in 2024 driven primarily by the extraction of uranium at Alta Mesa and Rosita which commenced in 2024.

112. The also Company explained that "until June 28, 2024, the Company was classified as a Foreign Private Issuer and complied with Canadian financial reporting standards (IFRS)" but "[o]n June 28, 2024, the Company met the requirements to be subject to the Sarbanes-Oxley Act of 2002 Section 404(b) ("SOX") as of December 31, 2024, requiring retroactive application to January 1, 2024." Moreover, the Company revealed that it had in fact "identified in 2024" a "material weakness" in its internal controls over financial reporting, "primarily due to an ineffective control environment that resulted in ineffective risk assessment, information and communications and monitoring activities." The Company revealed that it had "throughout the time period in 2024 in which the Company found it was required to be compliant with SOX" "invested significant time and resources" to "beg[in] implementing corrective measures" but the material weakness had not been "fully remediated."

113. The annual report stated the following, in relevant part:

> ***On June 28, 2024, the Company met the requirements to be subject to the Sarbanes-Oxley Act of 2002 Section 404(b) ("SOX") as of December 31, 2024, requiring retroactive application to January 1, 2024 for process level and general information technology controls***. Our management, under the supervision and with the participation of our CEO and CFO, has evaluated the design and effectiveness of our disclosure controls and procedures as of December 31, 2024. Based on that evaluation, ***our CEO and CFO have each concluded that such disclosure controls and procedures were not effective as of December 31, 2024, because of material weaknesses in internal control over financial reporting described below***.

114. The annual report continued, describing two major material weaknesses in the Company's internal controls over financial reporting that existed throughout the Class Period:

> ***Management identified the following material weaknesses in internal control over financial reporting as of December 31, 2024.***
>
> •The Company had ineffective general information technology controls ("GITCs") that support the consistent operation of the Company's information technology ("IT") systems, including its enterprise resource planning system. As a result, automated process-level controls and manual controls dependent upon the accuracy and completeness of information derived from those IT systems were also ineffective because they could have been adversely impacted; and
>
> •The Company did not effectively design, implement, or operate process-level control activities related to its financial reporting processes.

115. The annual report continued, describing the source of the material weaknesses:

> ***Management concluded that these material weaknesses were primarily due to an ineffective control environment that resulted in ineffective risk assessment, information and communications and monitoring activities:***
>
> •The Company did not have a sufficient number of trained resources with expertise in and responsibility and accountability for the design, implementation, operation and documentation of internal control over financial reporting and IT systems.
>
> •The Company did not have an effective risk assessment process related to internal control over financial reporting that defined clear financial reporting objectives and evaluated risks, including risks resulting from changes in the external environment and business operations, at a sufficient level of detail to identify all relevant risks of material misstatement to the consolidated financial statements and design and implement internal controls that responded to those risks.
>
> •The Company did not have an effective information and communication process that identified and assessed the source of and controls necessary to ensure the reliability of information used in financial reporting and that communicates relevant information about roles and responsibilities for internal control over financial reporting.
>
> •The Company did not have effective monitoring activities to assess the operation of internal control over financial reporting, including the continued appropriateness of control design and level of documentation maintained to support control effectiveness.

116. The annual report also noted that the Company's independent auditor, KPMG, had "issued an adverse opinion on the effectiveness of the Company's internal control over financial reporting" and attached a report by KPMG detailing the auditor's opinion.

117. The annual report also detailed remediation activities, which it implied had begun in June 2024 and described as ongoing:

> ***Until June 28, 2024, the Company was classified as a Foreign Private Issuer and complied with Canadian financial reporting standards (IFRS) and the Canadian Auditing Standards (CAS), which are overseen by the Canadian Public Accountability Board (CPAB) without incident.***
>
> ***With respect to the material weaknesses identified in 2024, management, with oversight from the Audit Committee of the Board of Directors, began implementing corrective measures throughout the time period in 2024 in which the Company found it was required to be compliant with SOX and have continued those efforts into 2025. The Company has invested significant time and resources to enhance the design, implementation, and operation of its internal control over financial reporting*** to move from its previous compliance under CPAB to the differing standards of SOX.
>
> As of the date of this filing, processes and procedures have been implemented to address these material weaknesses. However, as they have not been in place long enough, their effectiveness cannot yet be fully concluded, and they cannot be considered fully remediated at this time.

118. On this news, enCore's stock price fell $1.17, or 46.4%, to close at $1.35 per share on March 3, 2025, on unusually heavy trading volume.

119. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

120. As alleged herein, Defendants acted with scienter in that they knew the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to

the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and in actions intended to manipulate the market price of enCore's common stock as primary violations of the federal securities laws. The information in this section summarizes certain additional allegations that detail the Individual Defendants' scienter, and the cumulative knowledge of the Company's senior leadership, including the Individual Defendants, regarding the matters addressed herein, properly imputed to the Company.

121. ***The Company admitted that it learned of material weaknesses in internal controls over financial reporting "in 2024" but concealed that information from investors.*** As noted above, on March 3, 2025, the Company revealed that it had "identified in 2024" a "material weakness" in its internal controls over financial reporting, "primarily due to an ineffective control environment that resulted in ineffective risk assessment, information and communications and monitoring activities." In particular, the identified material weaknesses included "ineffective general information technology controls ("GITCs")" and that "[t]he Company did not effectively design, implement, or operate process-level control activities related to its financial reporting processes." Both of these material weaknesses "were primarily due to an ineffective control environment that resulted in ineffective risk assessment, information and communications and monitoring activities." As described above, each of these sources of potential error in the Company's financial reporting was the result of deliberate choices made by Defendants and would have been obvious to enCore's management and Directors even before the issues were "identified in 2024."

122. Additionally, the Company implied that it "began implementing corrective measures" after qualifying as a U.S. Domestic filer in June 2024 and that those efforts involved

both "management" and the "Audit Committee of the Board of Directors" continued "throughout the time period in 2024 in which the Company found it was required to be compliant with SOX."

123. The Company's public statements throughout 2024 not only failed to mention the identified material weaknesses, they reincorporated by reference statements falsely assuring investors that no material weaknesses existed. For example, the FY23 40-F stated there were "no material weaknesses in the Company's internal control over financial reporting." The three published unaudited condensed consolidated financial statements filed as part of the Q1 2024 6-K, the Q2 2024 6-K and the Q3 2024 6-K omitted reference to any known material weaknesses with the Company's internal controls of financial reporting and repeatedly cross referenced the FY 2023 40-F. In addition, each of the certifications signed by the Individual Defendants accompanying the Q1 2024 6-K, the Q2 2024 6-K and the Q3 2024 6-K indicated "N/A" or "not applicable" adjacent to item 5.2, relating to material weaknesses relating to internal controls of financial reporting. The result was a drumbeat of public financial statements which concealed the existence of known material weaknesses in the Company's internal controls over financial reporting and systematically understated enCore's ballooning losses—which the Company later admitted "management" was actively working to remediate during the same period.

124. The concealment of a known material weakness in internal controls of financial reporting is quintessential securities fraud. The Company's admission on March 3, 2025, that the material weaknesses came to light "in 2024," implication that remediation efforts had been ongoing since June 2024, together with Defendants' affirmative assurances or misleading omissions during the Class Period that no such weaknesses existed, supports an inference of at least recklessness with regard to the truth. This is particularly true because the subject of Defendants' misleading statements included the Company's core financial metrics, and the

revelation of the weaknesses in internal controls over financial reporting was accompanied by the simultaneous revelation that the Company's net losses had exploded, and that, without formally withdrawing them, the previous year's financial disclosures were effectively unreliable based on the accounting standards that would apply going forward.

125. ***In addition to signing the misleading statements, the Individual Defendants personally participated in composing and were responsible for overseeing enCore's financial disclosures.*** Defendant Goranson signed the FY23 40-F, and both Individual Defendants signed the In addition, the FY23 40-F touted the personal participation of Defendant Goranson and Defendant Wilson in the composition of financial reports filed with the SEC, stating that at the end of December 2023, the Company had conducted "an evaluation…carried out under the supervision of, and with the participation of, the Company's management, including its Chief Executive Officer (CEO) and Chief Financial Officer (CFO), of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act)." "Based upon that evaluation" the filing continued, "the Company's CEO and CFO have concluded that the Company's disclosure controls and procedures were effective to give reasonable assurance that" its public statements met the requirements of "the Securities Exchange Acts of 1934." The same filing clarified that "Management," indicating the Individual Defendants, "is responsible for establishing and maintaining adequate internal control over financial reporting" as defined by the Exchange Act.

126. The reference to the certification required by Section 302(a) of the Sarbanes-Oxley Act of 2002 clarified that the Individual Defendants acknowledged their personal responsibility for the truthfulness, accuracy, and completeness of the statements in the FY23 40-F. Put another way, during the Class Period, the Company (1) admitted the direct involvement of the Individual

Defendants in the review and publication of the misleading statements, (2) represented their subjective opinions concerning those statements as being consistent with the requirements of the Exchange Act, and (3) noted their personal responsibility for the underlying financial reporting processes that gave rise to the figures disclosed to investors—despite later admitting that they were contemporaneously aware of material weaknesses in the internal controls over those same financial reporting processes. In short, the Company's disclosures, which are equivalent to the certifications required by the Sarbanes-Oxley Act of 2002, and later admissions of known material weaknesses, preclude the possibility that the Individual Defendants might not have known their statements above omitted material facts at the time they were made.

127. ***The sheer degree and magnitude of the misstatements bely an innocent explanation.*** As described above, on March 3, 2025, enCore revealed, without warning, that the Company's net losses had more than doubled over the previous year, that the Company was plagued by known material weaknesses in its financial controls, and that the leadership of the Company was changing effective immediately. Investors had been given no warning of the collapse of the Company's balance sheet—indeed, throughout 2024, they had been repeatedly reassured in confident and unqualified terms that enCore's financials had been prepared in a manner consistent with applicable accounting standards and that there were no known material weaknesses with internal controls over financial reporting. The revelations made on March 3, 2025, came as a shock and their scope fundamentally altered the market's evaluation of the position of the Company, resulting in enCore's stock price being nearly cut in half. This is not merely a case of a missed projections because of unexpected headwinds. The magnitude of the misrepresentations supports an inference of scienter, because the enormous discrepancies between the Company's public statements and actual status with respect to measures of its core financial

health weigh heavily against any non-fraudulent alternative explanation. The sheer size of the concealed net loss and known material weaknesses supports an inference of fraud.

128. ***The short duration of time between the false statements and the emergence of the truth supports an inference of scienter.*** The temporal proximity between Defendants false and misleading statements and material omissions and the corrective disclosures supports an inference of scienter, particularly because the corrective disclosures on March 3, 2025 revealed pre-existing facts concerning the Company's knowledge during 2024 about the material weaknesses in its internal controls over financial reporting.

129. The Company's most recent financial disclosures were released just three months earlier, on November 14, 2024. Those figures had shown an operating loss of just $31.18 million in the nine months up to September 30, 2024—but investors discovered on March 3, 2025, that the true figure for the full year was nearly double that amount. Defendants also

130. Investors were given one set of numbers and assurances just three months before they were informed those statements were dramatically incorrect. The short span of time between when the Company last reassured investors and when it revealed that its losses were snowballing and the material weakness in the Company's internal controls over financial reporting suggests fraudulent intent as the corrective disclosures exposed facts that necessarily existed when the earlier statements were made and confirmed that Defendants were aware of those facts. The Company's corrective disclosures on March 3, 2025, confirmed that the material weaknesses in the Company's internal controls over financial reporting were known "in 2024." Additionally, as noted above, the Company's SEC filings confirm the Individual Defendants had access to the information concerning the Company's internal financial controls and personal involvement with composing the financial statements reporting the Company's net losses—indicating they already

possessed the information later disclosed. Notably, the corrective disclosures were made with the next required periodic financial disclosure at the end of the first quarter of 2025 immediately following the Company's change in its outside auditor, which had been announced on November 27, 2024. That the truth was disclosed in the required regulatory filing immediately after a change in enCore's external auditor supports an inference of fraud as it suggests the problems with the Company's internal controls and dramatically understated losses were readily apparent.

131. ***The Core Operations doctrine supports an inference of scienter.*** The issues with enCore's misleading financial disclosures are so significant that it would be absurd to suggest the Company's management was not aware of them—even enCore had not admitted as much. Additionally, each of the circumstances supporting the application of the Core Operations Doctrine applies.

132. First, enCore is a relatively small company. In a YouTube short posted February 13, 2024, Defendant Goranson states "I started with enCore back in October 2020 we had three employees. Going into 2024 now with 90 employees." According to a letter to from December 2023, the Company had just three employees in 2021, and 80 employees at the end of 2023. As of late 2025, according to *The Financial Times*, enCore has 131 employees. The small size of the Company makes it less plausible that the Individual Defendants were unfamiliar with the particular expenses driving the Company's reported losses revealed in March 2025.

133. Second, assessments of the cost of mineral extraction were central to the company's continued viability. The value of enCore's proven uranium reserves and the cost of extracting that material is of central importance to the Company. Plus, for any business, the doubling of net losses year-over-year would represent a significant development that management would, by necessity, either have been aware of or recklessly ignore.

134. Third, the Individual defendants were clearly familiar with the financial information reported in their misleading statements, including its underlying causes relating to expenses incurred in the course of mineral exploration and extraction. For example, on his LinkedIn page, Defendant Goranson touts his "38 years of experience in minerals extraction industry principally in the uranium recovery sector" and his status as a "Registered Professional Engineer…a Certified Director by the NACD" and a "'Qualified Person' as defined by National Instrument 43-101 and Regulation S-K 1300." The nature of the material weaknesses and the differences between the two measures of qualified expenses would have been readily apparent to Goranson.

135. Fourth, enCore's statements are internally inconsistent with the Company's later admissions. SEC filings throughout the Class Period made no mention of the material weaknesses that the Company later admitted it had known about since 2024—in fact they went further and repeatedly signed certifications denying that any such material weaknesses existed. There is no way to reconcile the Individual Defendants' Class Period certifications that there were no known material weaknesses with internal controls over financial reporting with the Company's later disclosure that there were such material weaknesses and that that was known in 2024.

136. ***Defendant Goranson's rushed and acrimonious exit from the leadership of the Company supports an inference of scienter.*** In a March 3, 2025 8-K, enCore disclosed that "[o]n March 2, 2025, the board of directors of enCore appointed Robert Willette, the current Chief Legal Officer, as Acting Chief Executive Officer effective immediately. Mr. Willette succeeds Paul Goranson, who is no longer serving as enCore's Chief Executive Officer or a as a member of the board of directors." Law360 summarized the transition with the headline "EnCore Energy Abruptly Appoints Legal Chief as Acting CEO." There was no indication that Defendant Goranson

voluntarily resigned and the acrimony between Goranson and the Company after his exit described below effectively confirms he was forced out of the Company.

137. After leaving enCore, Goranson filed an arbitration demand against the Company on April 23, 2025, alleging a breach of his employment agreement and demanding payment of claimed wages and attorneys' fees and payment of costs associated with health insurance coverage through COBRA. On October 10, 2025, enCore, through its subsidiary URI, Inc. entered into a settlement agreement with Defendant Goranson concerning his removal from the company. The settlement agreement, subsequently filed as an exhibit to a Form 8-K filing made with the SEC on October 17, 2025, describes Goranson's employment as having been "terminated" on March 2, 2025, and provided payment of $922,033.62 to Goranson in exchange for a release of claims and a non-disparagement agreement among other provisions.

138. Among other provisions Goranson "acknowledge[d] and agree[d] that his resignation from [his] positions as enCore's Chief Executive Officer and as a member of the Board…were effective as of [March 2, 2025]" and further that he would, upon request "execute any documents or instruments that the Company may deem necessary or desirable to effectuate such resignations" and related matters—confirming that Goranson had not previously formally resigned.

139. The rushed nature of Goranson's exit from the Company, "effective immediately," and the records from his arbitration claim against the Company support the inference of a direct relationship between Goranson's termination as CEO and removal from enCore's Board and the simultaneous revelation of the fraudulent concealment of known material weaknesses in internal controls of financial reporting as well as the Company's release of negative financial news, including the unchecked snowballing of reported expenses. Goranson made each of the allegedly

misleading statements above by signing them, in addition to personally certifying the accuracy of the allegedly misleading statements claiming there were no known material weaknesses with internal controls over financial reporting. Goranson was also in a position to understand the misleading nature of the statements based on his "38 years of experience in minerals extraction industry principally in the uranium recovery sector" and his status as a "Registered Professional Engineer…a Certified Director by the NACD" and a "'Qualified Person' as defined by National Instrument 43-101 and Regulation S-K 1300."

140. Other circumstantial evidence supports the inference of a direct link between Goranson's departure and the alleged fraud. For example, the Company did not even offer a pretextual explanation for Goranson's immediate departure and removal from the board. Additionally, Defendant Goranson did not appear to have alternative employment lined up, and notes on his LinkedIn page that following his termination from enCore he resumed "freelance" consulting through "Hot Metal Consulting LLC" a solo consulting operation he had previously opened during a period of self-employment in late 2020. Goranson's departure also came just months after the Company took on KPMG LLP as its new auditor in late November 2024—suggesting that his involvement in the Company's concealment of known material weaknesses in financial reporting and systematic understatement of expenses was quickly recognized by KPMG. In short, there are no facts to support an alternative explanation for Goranson's removal, such as routine turnover or unrelated business developments—all indications are that Goranson was terminated *because* of his involvement with the misconduct and mismanagement revealed on March 3, 2025.

141. ***Other turnover on the Company's leadership supports an inference of scienter.*** On January 6, 2015, the Company announced that Richard Cherry had joined enCore's Board of

Directors. Cherry was described in an enCore press release as "a veteran executive of the nuclear industry" with more than 40 years of experience serving as a high-level executive or director of several companies in the nuclear energy industry as well as holding an M.S. in Mechanical Engineering. As noted above, Cherry served on the Board's audit committee during the Class Period. Information circulated before the Company's 2024 annual meeting noted that Cherry had a perfect attendance record as a director.

142. Cherry was included in the Company's slate of recommended directors circulated to shareholders on July 29, 2024 and was reappointed to the Board on August 28, 2024. But just weeks later, on October 17, 2024, enCore announced that Stacy Nieuwoudt would join the Company's Board of Directors and serve on the Audit Committee—buried in the same press release was the terse disclosure that "Richard Cherry has resigned as a Director of the Company" but would remain a "Technical Advisor." No reason was provided for Cherry's resignation, nor was any explanation offered for what had changed in the month between Cherry's reappointment and his resignation.

143. Less than a month after Cherry's resignation, on November 14, 2024, the Company released its Q3 2024 6-K. On November 27, 2024, the Company announced that it was changing its external auditor to KPMG, and, as noted above, announced that effective January 1, 2025, its reporting status with the SEC would change to a U.S. domestic filer, with reporting obligations consistent therewith retroactive to January 1, 2024.

144. The timing and circumstance of this resignation by such a long-tenured director supports the inference that Defendants' statements were knowingly false. As a member of the Audit Committee, Cherry would have been in a position to understand the significance of the impending change in SEC reporting status and personally oversee the process that ultimately

resulted in a change in the Company's auditor. The Company admitted on March 3, 2025, that it learned of material weaknesses in internal controls over financial reporting in 2024. The members of the Board's Audit Committee would likely have been among the first to learn of those issues outside of management. Had Cherry remained on the Board, he would have had to sign-off on the Q3 2024 6-K. The result of his change in status at enCore was that Cherry would still be able to advise the Company's leadership and contribute to the enterprise to which he had committed a decade of service, but was no longer legally responsible for overseeing the Company's financial statements or the audit process. Despite his decade of service, impeccable attendance record, and recent reappointment to the Board of Directors, Cherry's resignation was timed perfectly to avoid being implicated by the Q3 2024 6-K's certification that the Board found there were no known material weaknesses in internal controls over financial reporting. The timing of Cherry's abrupt and unexplained resignation suggests that did not want to put his name on the Q3 2024 6-K and thus supports the inference of scienter.

145. On July 29, 2025, it was announced that Defendant Wilson would no longer serve as CFO after the filing of the Company's Quarterly Report on Form 10-Q for the period ending on June 30, 2025. Unlike with Goranson, the announcement of Wilson's departure from the Company came in advance and was accompanied by a statement clarifying "[t]he departure of Ms. Wilson is not due to any disagreement with the Company on any matter relating to the Company's operations, policies or practices, including with respect to accounting principles, financial statement disclosure or internal controls."

146. In summation, as set forth elsewhere herein in detail, Defendants, because of their receipt of information reflecting the true facts regarding enCore, their control over, and/or receipt or modification of, enCore's allegedly materially misleading misstatements, and/or their

associations with the Company that made them privy to confidential proprietary information concerning enCore, participated in the fraudulent scheme alleged herein.

147. As such, an inference that the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein is at least a plausible as any alternative.

## LOSS CAUSATION/ECONOMIC LOSS

148. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

149. As noted above, on March 3, 2025, before the market opened, enCore announced its fiscal 2024 financial results, revealing a net loss of $61.3 million (more than double its net loss of $25.6 million in the prior fiscal year). The Company explained "the inability to capitalize certain exploratory and development costs under U.S. GAAP which would have been capitalized under IFRS [International Financial Reporting Standards]" impacted the Company's results. Further, the Company revealed that it had "identified in 2024" a "material weakness" in the Company's internal controls over financial reporting, "primarily due to an ineffective control environment that resulted in ineffective risk assessment, information and communications and monitoring activities."

150. Also on March 3, 2025, the Company revealed that "effective immediately" as of March 2, 2025, its CEO, Defendant Paul Goranson, was "no longer serving as enCore's Chief Executive Officer or as a member of the board of directors." The Company noted that it had appointed Robert Willette, enCore's Chief Legal and Compliance Officer, as the new acting Chief Executive Officer, while it began a search for a permanent replacement for Goranson.

151. On this news, enCore's stock price fell $1.17, or 46.4%, to close at $1.35 per share on March 3, 2025, on unusually heavy trading volume.

152. The drop in enCore's share price on March 3, 2025, was the single biggest one-day loss in the Company's history on the NASDAQ and brought it to a new 52-weeek low.

153. Observers tied the drop in stock price directly to the subject of Defendants' misstatements. An article published on Yahoo! Finance, for example, noted "Shares of enCore Energy Corp. (NASDAQ:EU) plunged after the company announced its Q4 2024 results, which were below market expectations. EU announced revenue of $19.24 million during the quarter, missing estimates by over $550,000. The company also reported a loss per share of $0.14, far below expectations of a loss per share of $0.03. enCore's loss for the full-year 2024 increased by over 139% YoY to $61.3 million, raising concerns about its profitability."

154. The decline in enCore's stock price on March 3, 2025, is directly attributable to the corrective disclosures of known material weaknesses in the Company's internal controls over financial reporting and the unchecked growth of its expenses resulting in the Company nearly doubling its net losses over the prior year.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

155. Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted in this complaint against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

156. In the alternative, Plaintiff is entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b) The omissions and misrepresentations were material;

c) The Company's common stock traded in efficient markets;

d) The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e) Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

157. At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, including B. Riley, Conaccord Genuity, and H.C. Wainwright, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

158. The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

159. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## CLASS ACTION ALLEGATIONS

160. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired enCore common stock between March 28, 2024 and March 2, 2025, inclusive. Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

161. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

162. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a) Whether Defendants violated the Exchange Act;

b) Whether Defendants omitted and/or misrepresented material facts;

c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e) Whether the price of the Company's stock was artificially inflated; and

f) The extent of damage sustained by Class members and the appropriate measure of damages.

163. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

164. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

165. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**
**For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

166. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

167. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

168. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

169. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if

they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**COUNT II**
**For Violations of §20(a) of the Exchange Act**
**(Against the Individual Defendants)**

170. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

171. Defendants acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents where false or misleading statements were made and other statements alleged by Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Lead Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory and punitive damages in favor of Lead Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a

result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

C. Awarding Lead Plaintiff and other members of the Class their reasonable costs and expenses in this litigation, including attorneys' fees, experts' fees and other reasonable costs and disbursements; and

D. Awarding Lead Plaintiff and the other Class members such other relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Lead Plaintiff hereby demands a trial by jury.

DATED: January 9, 2026

Respectfully submitted,

*/s/ Jeffrey C. Block*
Jeffrey C. Block (*pro hac vice*)
Jacob A. Walker (*pro hac vice*)
Brendan Jarboe (*pro hac vice*)
Sarah E. Delaney (*pro hac vice*)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600
jeff@blockleviton.com
jake@blockleviton.com
brendan@blockleviton.com
sarah@blockleviton.com

*Counsel for Lead Plaintiff and the Proposed Class*

Joe Kendall, Attorney-in-charge
Texas Bar No. 11260700
S.D. Tex. Bar. No. 30973
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek, Suite 825
Dallas, Texas 75219
(214) 744-3000
jkendall@kendalllawgroup.com

*Texas Local/Liaison Counsel for Lead Plaintiff and the Proposed Class*